**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

---

**CHARLES A. SHAW, JR.,**

                                **Plaintiff,**                          **01-CV-00179A(Sr)**

**v.**

**JO ANNE B. BARNHART,**
**Commissioner of Social Security,**

                                **Defendant.**

---

## REPORT, RECOMMENDATION AND ORDER

          This matter was referred to the undersigned by the Hon. Richard J.

Arcara, to hear and report, in accordance with 28 U.S.C. § 636(b).  Dkt. #10.


          Plaintiff commenced this action pursuant to 42 U.S.C. § 405(g), seeking

review of the final decision of the Commissioner of Social Security ("Commissioner"),

denying his application for supplemental security income ("SSI"), benefits.  Dkt. #1.

The Commissioner moved for judgment on the pleadings pursuant to

Fed.R.Civ.P. 12(c).  Dkt. #14.  Following oral argument of this motion, plaintiff retained

counsel, who requested and received permission to file a motion for judgment on the

pleadings.  Dkt. ##23, 24.[1]  For the following reasons, it is recommended that the

Commissioner's motion be granted and the plaintiff's motion be denied.

---

[1] Plaintiff filed a memorandum of law in support of his motion for judgment on the pleadings (Dkt. #24), but did not file a notice of motion.

## PROCEDURAL BACKGROUND [2]

Plaintiff filed an application for Social Security Disability Insurance

("SSDI"), and Supplemental Security Income ("SSI"), on January 14, 1997, claiming

disability due to seizures, high blood pressure, a heart problem, arthritis and lupus.

T136.  His application was denied initially and upon reconsideration.  T105, 110, 451,

455.  A hearing, as requested by plaintiff, was conducted before Administrative Law

Judge ("ALJ"), Terence Farrell on February 19, 1998.  T34.  Plaintiff was accompanied

by an attorney, Regina Reitz.  T36.  On May 29, 1998, the ALJ issued a decision

denying plaintiff's claim.  T20-25.  The ALJ's determination became the final decision of

the Commissioner on January 31, 2001, when the Appeals Council denied plaintiff's

request for review.  T7.

## FACTUAL BACKGROUND

Medical Records

Plaintiff was examined by Thomas C. Dickinson, Ph.D., a certified clinical

psychologist, on July 6, 1995 for evaluation by the "Bureau of Disability Determination."

Plaintiff scored a full scale IQ of 84 on the Wechsler Adult Intelligence Scale, placing

him in the dull-normal range.  T442.  The Bender-Gestalt Test suggested "average

intellectual level" and an "educational appraisal found low but functional levels."  T442.

Plaintiff

> earned an IQ estimate of 95 upon the Ammons Test to show
> good range of functional and daily vocabulary.  He scored at
> the high seventh grade for word recognition task . . . at the

---

[2] References to "T" are to the certified transcript of the administrative record filed by the defendant in this action.  Dkt. #9.

> low fifth grade for spelling . . . and at the high sixth grade for
> math . . . upon the WRAT.

T442.  Overall, Dr. Dickenson concluded that

> Our current testing noted a man of basically low-average
> intellectual level and with low but functional educational
> skills.  Our session found a friendly and cooperative man
> who denied any mental or emotional troubles currently.  His
> self-reporting on clinical measure found little in way of any
> disturbance.  He is oriented and gave logical and friendly
> replies.  We noticed no troubles with attention or frustration
> in our series of tasks.  Suggestion for VESID application was
> made.

T443.

Plaintiff was admitted to the Veteran's Administration Medical Center

("VAMC"), from July 1-11, 1996 with a diagnosis of a non Q wave myocardial infarction.

T365, 419.  A cardiac catheterization was performed on July 9, 1996, revealing: (1)

elevated left ventricular end-diastolic pressure at rest; (2) borderline left ventricular

function; and (3) single vessel coronary artery disease.  T420.  On July 11, 1996, it was

noted that plaintiff "has lupus anticoagulant antibody [sic] has falsely elevated PTT."

T332.

A cardiac catheterization (coronary angioplasty) of the diagonal branch

was performed on July 17, 1996 with the following results:

> 1. The subtotal occlusion in the midLAD improved to
> residual 40% diameter-stenosis.
>
> 2. The 90% lesion in the first diagonal artery improved to
> residual 25% diameter-stenosis.

There was residual haziness at the sites of angioplasty, consistent with some residual thrombus, but there was excellent flow distally in both LAD and first diagonal arteries.

T367, 435-36.  Thereafter, plaintiff

underwent thallium stress testing which revealed an exercise capacity of 10 METS but showed evidence for reversible ischemia in the antero septal region.  He eventually underwent successful percutaneous transluminal coronary angioplasty of both the LAD and diagonal lesion.  Although he was left with minimal luminal stenosis in the first diagonal branch he had a residual 40% stenosis of the mid-LAD following angioplasty.

T386.

Plaintiff underwent a repeat cardiac catheterization on September 23, 1996, which revealed the following:

(1) Mild single vessel coronary artery disease.
(2) Both previous PTCA sites appear patent.   There has been minimal luminal narrowing at the PTCA site of the LAD.
(3) Normal LV systolic function.

T387.  The recommendation was for continued medical management with risk factor modification and exercise thallium stress testing to assess functional capacity and evaluate for ischemia in the LAD distribution.  T388.

On October 1, 1996, plaintiff was prescribed ibuprofin for his complaints of swollen hands.  T400.  During a rheumatology consult on October 17, 1996, Dr. Floyd Green noted lupus as "a possibility" and ordered lab tests.  T213.  At his return visit to the rheumatology department on November 5, 1996, Lisabette G. Siojo-Tapawan, M.D.,

diagnosed plaintiff with "probable" lupus and noted that plaintiff experienced relief from the swelling in his hand with Motrin.  T212.

On November 19, 1996, plaintiff complained of dizziness, but was noted to have been without his Diltiazem[3] for two days.  T211.  An ECG conducted on December 28, 1996 was normal, with no significant change noted from the September 25, 1996 ECG.  T384.  However, plaintiff was admitted to the VAMC from the emergency room following complaints of left arm numbness.  T389.  It was noted that plaintiff's Diltiazem dose had been decreased recently and that plaintiff had been working longer than usual hours and was under stress due to his wife's illness.  T390. Plaintiff was discharged with instructions to restore his Diltiazem dose to previous levels.  T390.   An ECG performed in January, 1997, was normal.  T383.

Dr. Ashraf Azeb, M.D. of Independent Medical Opinions, P.C., examined plaintiff on February 7, 1997.  T349.  Dr. Azeb's examination noted "[t]enderness and limitation of flexion extension of both wrists" with full range of movement.  T350.  His impression was of "past medical history significant for lupus which seems to be in remission" and "coronary heart disease with history of angioplasty in 1996."  T350.

---

[3]        Diltiazem is used to treat high blood pressure and to control chest
        pain (angina). Diltiazem is in a class of medications called
        calcium-channel blockers. It works by relaxing the blood vessels so
        the heart does not have to pump as hard. It also increases the
        supply of blood and oxygen to the heart.
*See* http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a684027.html#why

A Physical Residual Functional Capacity Assessment completed by a state agency medical consultant and affirmed by Dr. Anthony L. Danza, determined that plaintiff was capable of occasionally lifting twenty pounds, frequently lifting ten pounds, standing or walking about six hours in an eight hour workday and sitting about six hours in an eight hour workday.  T352.  He was also determined to have limitations in his upper extremities and gross manipulation.  T352, 354.  Specifically, it was determined that plaintiff's "heart condition and wrist limitation gives the claimant a residual functional capacity of light work."  T353.  Although noting that plaintiff had not had a seizure since 1984, it was determined that climbing should be avoided due to plaintiff's history of epilepsy.  T353.  His history of seizures and heart disease also required plaintiff to avoid exposure to hazards such as machinery and heights.  T355.  Plaintiff's blood pressure was noted to be stable with medication and it was noted that he had been diagnosed with probable SLE, as evidenced by an ESR of 6 and positive lupus anticoagulant.  T356.

On February 11, 1997, Dr. Siojo-Tapawan noted plaintiff's complaints of "recent swelling of hands and ankles" but observed no swelling upon examination and entered the following assessment/diagnosis: "no evidence active [lupus] at present." T205.

Plaintiff was admitted to the VAMC from September 10-12, 1997 after complaining of a transient episode of dizziness occurring at rest.  He had another episode after arrival in the Emergency Room at which time his heart rate was recorded

-6-

at 35 before it spontaneously resolved.  T446.  Plaintiff was admitted to the VAMC with

a temporary pacemaker which was discontinued after plaintiff denied any further

symptomology upon examination the following day.  T446.


Plaintiff underwent a myocardial perfusion (spect) on September 29, 1997

which revealed the following:

> Cardiolite myocardial perfusion image study is essentially
> within normal limits.
>
> Note: When this study is compared with the previous
> similar study done on 7/10/96, significant interval
> improvement of the perfusion to the left ventricular
> myocardium is noted.
>
> Note: The patient exercised on Bruce protocol and
> achieved 11 METS, and his peak heart rate went up to 173
> per minute, which was calculated to be the maximum age
> predicted heart rate.

T445.


Hearing Testimony

Plaintiff was 47 years old at the time of the hearing.  T46.  He is married

and lives with his wife in Buffalo.  T46.  Plaintiff has a GED and completed two years of

classes at Erie Community College.  T47.  He is one course short of obtaining his food

service Associate's Degree.  T54.


Plaintiff's past employment is primarily in the food service industry as a

prep cook.  T48, 52-54.  His most recent employment was as a supervisor at the Burger

King located in the VAMC, where he was responsible for inventory, cleanliness of the facility and staff job assignments.  T48.  That position required him to lift and carry 50-pound cases of ground beef and to stand for his entire shift.  T49.  He left that job on January 13, 1997 because he was experiencing dizzy spells due to his medication; the swelling in his hands prevented him from opening the 5-gallon plastic containers; and the swelling in his feet caused throbbing pins and needles in his lower legs.  T48, 72.

Plaintiff also worked as a maintenance person for Top Notch Janitorial Service, vacuuming, dusting, and cleaning offices and as a job supervisor for clients of Allentown Industries, training them to collect, wash and return trays to food court vendors and to clean tables, mop floors and take out the garbage.  T49-50, 51-53.

Plaintiff complained that he sweats and experiences dizziness as a side effect of his medication; experiences chest pains when he lifts anything over "20 pounds, 25 pounds;" can't walk when his legs or joints are swollen; and can't grasp objects when his hands are swollen.  T55, 58, 83.  He is also unable to stand.  T66.  Plaintiff is unable to take out the garbage, which he estimated to weigh approximately 10-15 pounds.  T65.  He takes ibuprofin three time a day to combat swelling.  T59.  As a result of his symptoms of dizziness and sweating, plaintiff testified that he spends approximately ten days a month in bed.  T56-57.  His chest pains usually last a "couple of minutes at the most" and subside with nitroglycerin.  T58.  He also experiences open sores on his hands and scalp caused by lupus.  T77.  Plaintiff testified that he would not be able to work in the kitchen with these sores due to health regulations.  T78-79.

-8-

Plaintiff's rheumatologist referred plaintiff to a psychologist, who plaintiff saw on four occasions. T67. She recommended that plaintiff do some volunteer work, so plaintiff is a Bingo caller at his church, sitting for two hours once a week. T66. He walks about ten minutes to visit a neighbor who lives less than a half mile away, spending approximately a half hour a day out of his home. T66, 68. He also walks his wife to the bus stop each morning. T81. Plaintiff testified that he tries to have dinner ready for his wife when she comes home from work and that he also vacuums and sometimes goes down to the basement and does laundry. T58. Plaintiff grocery shops himself, walking to the grocery store and using a pushcart to pull the groceries behind him. T69. He sleeps about eight hours a night and takes a two-hour nap just about every day. T81. He rides an exercise bike approximately 15 minutes a day. T82.

Dr. Kohn, a medical doctor specializing in internal medicine and cardiovascular diseases, testified as a medical expert. T39, 126. Dr. Kohn testified that plaintiff has arteriosclerotic heart disease, which required percutaneous angioplasty to dilate the affected coronary arteries, as well as evidence of a "circulating lupus anticoagulant, which is non-disabling." T40. Aside from the lupus anticoagulant, Dr. Kohn found "no other evidence in the medical record that [he] reviewed of a problem with lupus." T40. Dr. Kohn also noted "a past history of a seizure disorder, and a psychiatric problem." T40. Dr. Kohn opined that plaintiff's impairments, either alone or in combination did not demonstrate disability, stating:

> under cardiovascular impairments, 4.04C, he would need
> 50% more narrowing of the left main coronary artery. The
> most recent evidence was that he had less than that. That
> he would have to have, under Part A, limited exercise

> tolerance with less than 5 mets on an exercise tolerance
> test, and . . . in the records he was able to do 10 mets . . . .

T41.  Dr. Kohn opined that a 10 met exercise tolerance test demonstrated "no

significant limitations," explaining that, "if he tried to do things that are considered

extremely heavy like lifting very heavy weights and so on, there might be an

impairment, but ordinary activities of daily living and ordinary occupational

requirements, 10 mets is very good."  T42.


Dr. Kohn noted that the arteriosclerotic heart disease could produce an

impairment of less ventricular function resulting in anginal-like pain on activity if there

were sufficient residual narrowing, but found "no evidence by measurement in the

record."  T41.  Dr. Kohn opined that plaintiff's complaints of swollen hands and ankles

would not be related to arteriosclerotic heart disease, but could be related to lupus if

there was any evidence to support a diagnosis of lupus.  T41.


The vocational expert ("VE"), testified that plaintiff's past relevant work

experience included semi-skilled and unskilled positions requiring heavy, medium, light

and sedentary exertion.  T87-88.  The VE testified that plaintiff's position at Allentown

Industries was classified as skilled work, but determined that, as described by plaintiff, it

was more appropriately classified as semi-skilled work.  T87.  The VE also determined

that plaintiff's position as a fast food manager was a skilled position which

demonstrated the following transferable skills:

> ability to read and interpret business records and reports,
> the ability to analyze and interpret policies established by
> administrators, make business decisions based on
> production reports and similar facts, as well as experience in

> personal opinions, deal with the general public, customers,
> with tact and courtesy, plan and organize the work of others,
> change activity frequently and cope with interruptions, and
> accepting full responsibility for managing an activity.

T88-89, 91.

When asked to assume a younger individual between the ages of 45 to 49 with a high school equivalency degree who could perform the full range of light work, except for climbing, using his hands for more than occasional handling, or being exposed to hazards such as machinery and height, the VE testified that the plaintiff could not perform his past relevant work but could perform the position of information clerk, a semiskilled, sedentary position with approximately 4,900 positions regionally; bailiff, a semiskilled, light exertion position with approximately 215 positions available regionally, or surveillance system monitor, an unskilled, sedentary position with approximately 305 positions regionally.  T90.

Plaintiff's representative questioned plaintiff further about his management responsibilities at Burger King, which he described as follows:

> I was still a food service worker, but I was a supervisor in
> that unit, and my duties were to make sure the calibrations
> for all the equipment were correct and up to code, assign
> work duties for each individual that was in my unit, and do
> the inventory.

T92.  Plaintiff stated that he learned to calibrate the equipment without any training; that there were four people in his unit; and that he was responsible for informing his supervisor, the assistant to the chief of canteen operations, of supplies that needed to be ordered twice a week.  T92-94.

The plaintiff's representative also questioned the VE about Dr. Dickenson's report of July 6, 1995, at which time it was discovered that plaintiff's prior file had not been incorporated into the record.  T94-96.  The ALJ added the report to the plaintiff's record.  T96.  Plaintiff's representative informed the VE that the report indicated that plaintiff scored at a 6.4 grade level on the Grey Oral Reading test and high 6th grade level on the WRAT math test and asked if that would change her opinion as to plaintiff's employability.  T96-97.  The VE responded that the information clerk and bailiff positions would still be viable.  T97-100.  The plaintiff's representative argued that plaintiff abilities, as demonstrated by Dr. Dickenson's report, and his past employment in unskilled positions, demonstrate that a semiskilled job was beyond his capability. T100.  The plaintiff's representative also argued that there were an insufficient number of positions available as bailiffs and surveillance monitors to establish any real chance of plaintiff obtaining such a position.  T101.

ALJ's Decision

The ALJ determined that plaintiff suffers from heart disease, hyptertension and lupus in remission, but that these conditions are not disabling.  T24.  In reaching this conclusion, the ALJ relied upon the testimony of the impartial medical expert, Dr. Kohn, who testified that, from a cardiac perspective, plaintiff could perform most work so long as it did not require heavy lifting, as well as the plaintiff's testimony regarding his daily activities, including his ability to vacuum, grocery shop, cook, and visit friends and relatives.  T22-23.  While the ALJ determined that plaintiff was no longer capable of performing his past relevant work as a janitor or food preparer, he concluded that

plaintiff was capable of performing light work, except that he cannot climb or use his hands for more than occasional handling and must avoid all exposure to workplace hazards. T23. The ALJ noted that his "assessment conforms to the opinion of the state agency review physician . . . which is the only assessment of the claimant's residual functional capacity" and "is also not inconsistent with the opinion of the medical expert." T23. Noting that the medical vocational guidelines ("grids"), would direct a finding of not disabled for an individual of 48 years with a high school education plus two years of college if plaintiff were able to perform the full range of light work, the ALJ relied upon the testimony of the vocational expert that plaintiff's nonexertional limitations would still allow him to perform a significant number of jobs in the national economy to find him not disabled. T25.

## DISCUSSION AND ANALYSIS

### I.      Scope of Judicial Review.

The Social Security Act states that, upon review of the Commissioner's decision by the district court, "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive . . .." 42 U.S.C. § 405(g). Substantial evidence is defined as evidence which a "reasonable mind might accept as adequate to support a conclusion . . .." *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938), *quoted in Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Tejada v. Apfel,* 167 F.3d 770, 773-74 (2d Cir. 1999); *Snell v. Apfel*, 177 F.3d 128, 132 (2d Cir. 1999).

Under these standards, the scope of judicial review of the Commissioner's decision is limited, and the reviewing court may not try the case *de novo* nor substitute its findings for those of the Commissioner.  *Richardson*, 402 U.S. at 401.  The court's sole inquiry is "whether the record, read as a whole, yields such evidence as would allow a reasonable mind to accept the conclusions reached" by the Commissioner. *Sample v. Schweiker,* 694 F.2d 639, 642 (9th Cir. 1982).  "Further, if supported by substantial evidence, the [Commissioner's] finding must be sustained, 'even where substantial evidence may support the plaintiff's position and despite that the Court's independent analysis of the evidence may differ from the [Commissioner's].'"  *Martin v. Shalala,* No. 93-CV-898S, 1995 WL 222059, at *5 (W.D.N.Y. March 20, 1995), *citing Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992).

Before applying the substantial evidence test, the Court first "reviews the Commissioner's decision to determine whether the Commissioner applied the correct legal standard." *Tejada v. Apfel*, 167 F.3d at 773; *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987).  "Failure to apply the correct legal standards is grounds for reversal." *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984); *see Grey v. Heckler*, 721 F.2d 41, 44 (2d Cir. 1983) (Commissioner's determination "cannot be upheld when based on an erroneous view of the law that improperly disregards highly probative evidence.").

## II.     The Disability Standard.

The standards set forth in the Social Security Act provide that a person will be found to be disabled "if he is unable to engage in any substantial gainful activity by

reason of any medically determinable physical or mental impairment which . . . has

lasted or can be expected to last for a continuous period of not less than twelve months."

42 U.S.C. § 1382c(a)(3)(A).  The Act clarifies that "an individual shall be determined to

be under a disability only if his physical or mental impairment or impairments are of such

severity that he is not only unable to do his previous work but cannot, considering his

age, education, and work experience, engage in any other kind of substantial gainful

work which exists in the national economy . . .." 42 U.S.C. § 1382c(a)(3)(B).


In assessing whether a claimant is suffering from a disability, the ALJ is

required to follow a five-step sequential evaluation process:

1.  The Commissioner considers whether the claimant is
    currently engaged in substantial gainful activity.

2.  If not, the Commissioner considers whether the claimant
    has a "severe impairment" which limits his or her mental
    or physical ability to do basic work activities.

3.  If the claimant has a "severe impairment," the
    Commissioner must ask whether, based solely on medical
    evidence, claimant has an impairment listed in Appendix 1
    of the regulations.  If the claimant has one of these
    enumerated impairments, the Commissioner will
    automatically consider him disabled, without considering
    vocational factors such as age, education, and work
    experience.

4.  If the impairment is not "listed" in the regulations, the
    Commissioner then asks whether, despite the claimant's
    severe impairment, he or she has residual functional
    capacity to perform his or her past work.

5.  If the claimant is unable to perform his or her past work,
    the Commissioner then determines whether there is other
    work which the claimant could perform.  The
    Commissioner bears the burden of proof on this last step,
    while the claimant has the burden on the first four steps.

*Shaw v. Chater*, 221 F.3d at 132, *citing DeChirico v. Callahan*, 134 F.3d 1177, 1179-80 (2d Cir. 1986); *see* 20 C.F.R. § 404.1520 (1999).

III.    **Analysis**

Function by Function Assessment

Plaintiff argues that the ALJ committed legal error by failing to make a function by function assessment of his residual functional capacity, as required by Social Security Ruling 96-8p. Dkt. #24, p.5.  The Commissioner responds that the ALJ's reliance upon the state agency physician's function by function assessment is sufficient and notes that the state agency physician's assessment conforms with plaintiff's testimony and the medical evidence of record.  Dkt. #25, pp.3-5.

Social Security Ruling 96-8p provides that the ALJ's assessment of a claimant's residual functional capacity must identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function by function basis, including his ability to perform certain physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions, including manipulative or postural functions such as reaching, handling, stooping or crouching; his ability to carry out certain mental activities, such as understanding, remembering and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting; and any environmental restrictions resulting from, *e.g.*, skin, vision or hearing impairments or epilepsy.  *See* SSR 96-8P(4), 1996 WL 374184, at *1 (S.S.A.); 20 C.F.R. §§ 404.1545(b)-(d) & 416.945 (b)-(d).  Only after this assessment

has been completed may the ALJ express a claimant's residual functional capacity in terms of the exertional levels of work, *e.g.*, sedentary, light, medium, heavy, and very heavy.  SSR 96-8P(4), 1996 WL 374184, at *1.

In the instant case, the ALJ relied upon the residual functional capacity assessment completed by the state agency review physician which determined that plaintiff was capable of occasionally lifting twenty pounds, frequently lifting ten pounds, standing or walking about six hours in an eight hour workday and sitting about six hours in an eight hour workday.  T352.  It also concluded that plaintiff had limitations in his upper extremities and gross manipulation.  T352, 354.  Specifically, it was determined that plaintiff's "heart condition and wrist limitation gives the claimant a residual functional capacity of light work."  T353.  Although plaintiff stated that he had not had a seizure since 1984, the state agency review physician  determined that climbing should be avoided due to plaintiff's history of epilepsy.  T353.  His history of seizures and heart disease also required plaintiff to avoid exposure to hazards such as machinery and heights.  T355.  Plaintiff's blood pressure was noted to be stable with medication and it was noted that he had been diagnosed with probable SLE, as evidenced by an ESR of 6 and positive lupus anticoagulant.  T356.  The ALJ was entitled to rely upon this comprehensive assessment, which is consistent with other evidence in the record, to fulfill his obligation to consider plaintiff's limitations on a function by function basis.  *See Dudelson v. Barnhart*, 2005 WL 2249771, at *9-10 (S.D.N.Y. May 10, 2005) (ALJ properly relied upon treating physician's assessment in finding that plaintiff was capable of performing all of the tasks necessary to engage in her past relevant work).

-17-

Assessment of Intellectual Limitations

Plaintiff also argues that the ALJ failed to consider evidence of plaintiff's intellectual limitations in his determination of plaintiff's residual functional capacity and that if the ALJ had determined that plaintiff was incapable of performing semi-skilled positions, the VE's testimony would have limited plaintiff to the position of bailiff, which is not available in significant numbers to meet the Commissioner's burden of proof.  Dkt. #24, pp.7-10.   The Commissioner responds that the psychologist's report does not demonstrate that plaintiff suffered from a severe mental impairment and that the evidence in the record establishes that plaintiff is able to function and care for his needs on a daily basis.  Dkt. #25, pp.5-8.

There is no evidence in the record to suggest that plaintiff suffered from an intellectual impairment which would preclude him from performing semi-skilled work.[4] Dr. Dickenson's report, upon which plaintiff relies, indicates an "average intellectual level;" "functional educational skills;" and "no troubles with attention or frustration." T443.  The VE determined that plaintiff would be able to perform the positions of information clerk and bailiff with reading and writing skills equivalent to a sixth or seventh grade level and math skills equivalent to a sixth grade level. T96-100.   In any event, plaintiff completed his GED and two years of classes at Erie Community College, stopping one course short of obtaining an Associate's Degree in food services  T47, 54. Moreover, plaintiff's past employment history includes semi-skilled positions as a

---

[4] Semi-skilled work is defined as "work which needs some skills but does not require doing the more complex work duties."  20 C.F.R. § 404.1568(b).

supervisor at Burger King and as a job supervisor for clients of Allentown Industries. T48, 51-53, 92-94.  Thus, the ALJ's determination that plaintiff was capable of performing a significant number of jobs available in the national economy, including the semi-skilled positions of information clerk and bailiff and the unskilled position of surveillance system monitor, is supported by substantial evidence.

## CONCLUSION

Based on the foregoing, it is recommended that the Commissioner's motion for judgment on the pleadings (Dkt. #11), be **GRANTED** and that plaintiff's motion for judgment on the pleadings (Dkt. #24), be **DENIED**.  .

Accordingly, pursuant to 28 U.S.C. § 636(b)(1), it is hereby

ORDERED, that this Report, Recommendation and Order be filed with the Clerk of the Court.

ANY OBJECTIONS to this Report, Recommendation and Order must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed.R.Civ.P. 72(b) and Local Rule 72.3(a)(3).

The district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but was not presented to

the magistrate judge in the first instance.  *See, e.g., Patterson-Leitch Co. v. Massachusetts Mun. Wholesale Electric Co.*, 840 F.2d 985 (1st Cir. 1988).

<u>Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order</u>.  *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority."  <u>Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Report, Recommendation and Order), may result in the District Judge's refusal to consider the objection.</u>

The Clerk is hereby directed to send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**SO ORDERED.**

DATED:     Buffalo, New York
           January 9, 2006

                                    S/ H. Kenneth Schroeder, Jr.
                                    H. KENNETH SCHROEDER, JR.
                                    United States Magistrate Judge